IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

PROGRESS SOLAR SOLUTIONS,  )
                           )
            Plaintiff,     )
                           )
      v.                   )              No. 5:17-CV-152-D
                           )
FIRE PROTECTION, INC., et al.,  )
                           )
            Defendants.    )

PROGRESS SOLAR SOLUTIONS,  )
et al.,                    )
                           )
            Plaintiffs,    )
                           )
      v.                   )              No. 5:19-CV-5-D
                           )
MICHAEL D. LONG, et al.    )
                           )
            Defendants.    )

## ORDER

Progress Solar Solutions ("PSS") is a plaintiff in two lawsuits in the court. On February 23,

2017, PSS filed a complaint in Wake County Superior Court (the "2017 lawsuit") against Fire

Protection, Inc. ("FPI"), Solar Mod Systems, Inc. ("SMS"), Norman Stephen Van Valkenburgh, the

President, Director, and sole shareholder of FPI ("NSVV"), Mikel Bills, FPI Vice President of Sales

and agent for SMS ("Bills"), and Michael Long, the founder of SMS ("Long") (collectively,

"defendants") [D.E. 2-1].[1] On March 31, 2017, FPI removed the action to this court [D.E. 2]. The

dispute concerns PSS's portable solar light towers and defendants' efforts to compete with PSS for

---

[1] On June 27, 2018, PSS filed a second amended complaint, replacing decedent NSVV as
defendant with the executor or administrator of NSVV's estate and Jeffery Van Valkenburgh
("JVV"), the trustee of NSVV's irrevocable living trust [D.E. 89].

lucrative government contracts with the United States military, the Defense Logistics Agency ("DLA"), and the General Services Administration ("GSA"). See [D.E. 2.1]. PSS and SMS sold the portable solar light towers to entities designated by the Department of Defense as Maintenance, Repair, and Operations prime vendors ("MRO") including Nobles Supply and Logistics ("Nobles Supply") and ADS, Inc. and its TWI division ("ADS/TWI"). See id.

On January 4, 2019, PSS and Daniel Robertson ("Robertson"), PSS's owner and corporate manager, filed a complaint in this court (the "2019 lawsuit") against SMS, Bills, and Long [D.E. 1].[2] The dispute in the 2019 lawsuit also concerns SMS's, Bills's, and Long's efforts to compete with PSS for lucrative government contracts concerning the manufacture and sale of portable solar light towers. See id.

On September 5, 2019, PSS moved to consolidate the lawsuits and filed a memorandum in support. See [D.E. 123, 124], [D.E. 25, 26]. Defendants did not respond. On December 2, 2019, in the 2017 lawsuit, PSS moved for summary judgment concerning FPI's and SMS's counterclaims and filed memoranda and documents in support. See [D.E. 129, 130, 131, 132, 133, 134, 135]. SMS and FPI did not respond. On March 4, 2020, in the 2017 lawsuit, PSS moved for an entry of default and default judgment against SMS and to strike SMS's answer and filed a memorandum in support [D.E. 140, 141]. On March 6, 2020, in the 2019 lawsuit, Long, on behalf of himself and SMS, moved to dismiss [D.E. 37]. On March 24, 2020, PSS responded in opposition [D.E. 38]. On March 6, 2020, Bills moved to dismiss PSS's complaint in both actions. See [D.E. 142], [D.E. 36]. On March 27, 2020, PSS responded in opposition. See [D.E. 143], [D.E. 39]. On May 8, 2020, PSS moved to sanction Bills [D.E. 144]. On May 19, 2020, Bills responded in opposition [D.E. 146].

---

[2] For clarity, when citing to the 2017 lawsuit's and the 2019 lawsuit's docket, the court will underline citations to the 2019 lawsuit's docket, and will not underline citations to the 2017 docket.

On June 5, 2020, PSS moved to extend the deadlines of the court's scheduling order [D.E. 44]. On June 11, 2020, Bills responded in opposition [D.E. 45].

As explained below, the court grants PSS's motion to consolidate, grants PSS's motions for summary judgment concerning FPI and SMS's counterclaims, denies PSS's motion for an entry of default and default judgment against SMS and to strike SMS's answer, denies Bills's motion to dismiss, denies Long's motion to dismiss, denies PSS's motion to sanction Bills, and grants PSS's motion to extend the scheduling order deadlines.

## I.

PSS manufactures portable solar light towers powered by one of three energy sources: solar, solar and wind, or "solar/hybrid" (i.e., solar panels and a "back-up" generator). See [D.E. 89] ¶ 15, [D.E. 1] ¶ 13. PSS sells its portable solar light towers to the United States Military, the Department of Defense ("DOD"), or the Government Services Administration ("GSA"). See [D.E. 89] ¶ 16; [D.E. 1] ¶ 15. In April 2012, PSS and FPI entered into an International Dealer Agreement (the "Dealer Agreement") allowing FPI to sell PSS portable solar light towers to the DOD in 13 Middle Eastern countries. See [D.E. 89] ¶ 18; [D.E. 1] ¶ 17. FPI employed Bills as its National Sales Manager, and FPI employed Long as a representative. See [D.E. 89] ¶¶ 9, 18–20, 23–24, 69–70; [D.E. 1] ¶¶ 9, 17. As FPI representative, Long serviced PSS portable solar light towers in the Middle East, trained military personnel to use PSS's portable solar light towers, and helped Bills sell PSS portable solar light towers to the military. See [D.E. 89] ¶¶ 10, 30–39, 42–47, 54, 69; [D.E. 1] ¶¶ 8, 19, 35.

In 2015, Long worked with Robert Schmidt ("Schmidt"), a PSS sales consultant, and others to manufacture and sell a portable solar light tower to compete with PSS. See [D.E. 89] ¶¶ 43–44, 56; [D.E. 1] ¶¶ 20, 22, 28, 30, 32, 35–36. Long then formed SMS for this purpose. See [D.E. 89]

3

¶ 40; [D.E. 1] ¶¶ 31–33. After forming SMS, Long and Bills entered into a joint venture to manufacture and sell portable solar light towers through SMS. See [D.E. 89] ¶¶ 53, 56; [D.E. 1] ¶ 33. PSS alleges that Long and Bills used misinformation about PSS and its portable solar light towers to persuade military contractors to work with SMS. See [D.E. 89] ¶¶ 54–56, 58–61, 70–73; [D.E. 1] ¶¶ 20, 22, 28, 30, 32, 35–36. PSS also alleges that Long misappropriated Schmidt's intellectual property and confidential and proprietary information. See [D.E. 1] ¶¶ 39, 43–46.

In the 2017 lawsuit, PSS alleges 13 causes of action: (1) breach of contract against Long, SMS, and FPI; (2) trade secret misappropriation under 18 U.S.C. § 1836 against all defendants; (3) trade secret and proprietary information misappropriation under North Carolina law against all defendants; (4) trade secret and proprietary information misappropriation under Texas law against all defendants; (5) unfair and deceptive trade practices under North Carolina law against all defendants; (6) unfair competition against all defendants; (7) tortious interference with business relationships and prospective economic advantage against all defendants; (8) false advertising under 15 U.S.C. § 1125(a) against all defendants; (9) false association under 15 U.S.C. § 1125(a) against all defendants; (10) civil conspiracy against all defendants; (11) disgorgement of profits from all defendants; (12) unjust enrichment against all defendants; and (13) injunctive relief against all defendants. See [D.E. 89] ¶¶ 74–170.

In the 2019 lawsuit, PSS alleges seven causes of action: (1) breach of confidentiality agreement against SMS and Long; (2) trade secret and proprietary information misappropriation under North Carolina law against all defendants; (3) trade secret misappropriation under 18 U.S.C. § 1836 against all defendants; (4) trade secret and proprietary information misappropriation under Texas law against all defendants; (5) civil conspiracy against all defendants; (6) unjust enrichment against all defendants; and (7) disgorgement of profits from all defendants. See [D.E. 1] ¶¶ 47–107.

4

The court may consolidate actions if they "involve a common question of law or fact." Fed. R. Civ. P. 42(a); see Campbell v. Boston Sci. Corp., 882 F.3d 70, 74 (4th Cir. 2018). Common questions of law and fact do not have to predominate. Rather, a district court must find only that they exist and that consolidation will prove beneficial. See, e.g., Hanes Cos. v. Ronson, 712 F. Supp. 1223, 1230 (M.D.N.C. 1988). Although actions involving the same parties are apt candidates for consolidation, complete identity of parties is not required. A common question of law or fact is enough. See, e.g., Safran v. Sheriff of Nassau Cty., Nos. 12-CV-599 JFB, 12-CV-3296 JFB, 2012 WL 3027924, at *1 (E.D.N.Y. 2012) (unpublished); Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Reserve Sys., 770 F. Supp. 2d 283, 286 (D.D.C. 2011).

The purpose of consolidation is to avoid unnecessary cost or delay. See Equal Emp. Opportunity Comm'n v. HBE Corp., 135 F.3d 543, 550 (8th Cir. 1998); Ash v. PowerSecure Int'l, Inc., Nos. 4:14-CV-92-D, 5:14-CV-385-D, 5:14-CV-588-F, 2014 WL 5100607, at*1 (E.D.N.C. Oct. 10, 2014) (unpublished). "District courts have broad discretion under [Rule 42(a)] to consolidate causes pending in the same district." A/S J. Ludwig Mowinckles Rederi v. Tidewater Constr. Corp., 559 F.2d 928, 933 (4th Cir. 1977). In exercising its discretion, a court weighs the risks of possible prejudice and confusion from consolidation with the risks of inconsistent adjudications of common factual and legal issues, the burden on parties and judicial resources posed by multiple lawsuits, and other efficiencies created by a single suit in lieu of multiple suits. See Campbell, 882 F.3d at 74; Arnold v. E. Air Lines, Inc., 681 F.2d 186, 193 (4th Cir. 1982).

As for PSS's motions to consolidate, each defendant in the 2019 lawsuit is a defendant in the 2017 lawsuit. Additionally, in the 2019 lawsuit, PSS alleges six legal claims that it also alleges in the 2017 lawsuit. Moreover, both lawsuits concern numerous common factual issues, including SMS's and Long's designs to manufacture portable solar light towers that compete with PSS, the

5

features of SMS's towers, and defendants' profits from sales of the SMS towers. Furthermore, PSS plans to rely on the same evidence in both lawsuits. See [D.E. 124] 7. Consolidating the 2017 lawsuit and 2019 lawsuit prevents duplicative discovery concerning the defendants' creation, manufacture, and sale of competing solar light towers. Accordingly, common questions of both law and fact are present, and consolidation will benefit all parties and assist the efficient resolution of the parties' dispute. See, e.g., Campbell, 882 F.3d at 74; Arnold, 681 F.2d at 193; Ronson, 712 F. Supp. at 1230. After thoroughly reviewing the record, the court is satisfied that consolidation will not result in prejudice to any defendant. In any event, the court may reconsider its decision to consolidate should prejudice appear. See, e.g., Campbell, 882 F.3d at 74–75; Marketel Media v. Mediapotamus, Inc., Nos. 5:13-CV-427-D, 5:13-CV-693-D, 2013 WL 5965681, at *4 (E.D.N.C. Nov. 8, 2013) (unpublished). Thus, the court grants PSS's motions to consolidate.

## II.

In its answer to PSS's original complaint in the 2017 lawsuit, FPI alleged four counterclaims: (1) breach of contract; (2) breach of contract in violation of N.C. Gen Stat. §§ 66-190 et seq. (the "SRCA"); (3) unjust enrichment; and (4) accounting. See [D.E. 12] 18–26. As discussed, PSS moves for summary judgment on FPI's counterclaims [D.E. 129]. FPI did not oppose the motion.[3]

---

[3] FPI also does not oppose PSS's statements of material facts, and the court deems the material facts admitted. See Fed. R. Civ. P. 56(c); Local Civ. R. 56.1 (a)(2), (a)(4); Horton v. Methodist Univ., Inc., No. 5:16-CV-945-D, 2019 WL 320572, at *1 n.1 (E.D.N.C. Jan. 23, 2019) (unpublished), aff'd, 788 F. App'x 209 (4th Cir. 2019) (per curiam) (unpublished); Felton v. Moneysworth Linen Serv., Inc., 295 F. Supp. 3d 595, 597 n.1 (E.D.N.C. 2018); Howard v. Coll. of the Albermarle, 262 F. Supp. 3d 322, 329 n.1 (E.D.N.C.), aff'd, 697 F. App'x 257 (4th Cir. 2017) (per curiam) (unpublished).

## A.

In April 2012, PSS and FPI entered into the Dealer Agreement. See [D.E. 28-6]. Under the

Dealer Agreement, PSS granted FPI a non-exclusive right to "purchase, inventory, promote, and

resell" PSS products subject to the terms of the Dealer Agreement. See id. at 1. Additionally, the

Dealer Agreement provided that PSS could 'terminate [the Dealer Agreement] at any time by written

notice" if, inter alia, PSS offered a new or amended international dealer agreement to FPI. Id. at 6.

Upon termination of the Dealer Agreement, "[a]ll unshipped orders shall be canceled without

liability of either party to the other," and

> [n]either party shall be liable to the other because of such termination for
> compensation, reimbursement, or damages on account of loss of prospective profits
> or anticipated sales, or on account of expenditures, investments, leases or
> commitments in connection with the business or goodwill of PSS or FPI or for any
> other reason growing out of such termination.

Id. at 7. If PSS did not terminate the Dealer Agreement, the parties agreed that it would expire on

March 30, 2015. See id. at 6.

On October 29, 2014, PSS and FPI agreed to a memorandum of understanding ("MOU").

See [D.E. 12-1].[4] The MOU's stated purpose "is to establish an arrangement in which [PSS and

FPI] mutually benefit through the sale and distribution of PSS products" and "to trace FPI sales more

effectively." Id. Specifically, PSS and FPI agreed that FPI is an authorized dealer of PSS products

in the Middle East, that PSS will credit FPI for future sales based on sales projections FPI provides

to PSS on a monthly basis, and that the projections must include a primary contact, location, type,

and quantity. See id. The MOU did not provide terms concerning pricing of PSS products, and did

---

[4] FPI contends that emails between PSS and FPI on June 3, 2015, modified the October 2014
MOU. See [D.E. 12] 24; [D.E. 12-2] (June 3, 2015 emails). The court assumes without deciding
that the MOU was a valid contract, and that the June 3, 2015 emails modified that contract. The
court refers to the collective documents as the "MOU."

not state when the agreement expired. See id. When FPI and PSS did business under the MOU, FPI did not provide PSS with sales projections. See [D.E. 135] ¶¶ 3–5.

In March 2016, Robertson, on behalf of PSS, rejected a proposed, new MOU from FPI, noted that the Dealer Agreement "has indeed now expired," and stated that he would send FPI an "updated version" for FPI's signature. See [D.E. 134] 93–94, 109–10. On April 12, 2016, Robertson sent an "updated" dealer agreement to FPI. See id. at 72–92. In June 2016, Robertson notified FPI, Nobles Supply, and ADS/TWI that the Dealer Agreement had expired, and again engaged FPI concerning whether FPI intended to sign the "updated" dealer agreement. See id. at 41–44, 145–46 (Nobles), 147–48 (ADS/TWI).

FPI's counterclaims concern its efforts to sell 304 PSS portable solar light towers. See [D.E. 12] 22. Essentially, FPI asserts that it secured a commitment from Nobles Supply (on behalf of the DOD) to purchase 304 PSS portable solar light towers, that Nobles Supply entered a purchase order for 79 of the 304 portable solar light towers on August 8, 2016, and that the DOD purchased the remaining 225 portable solar light towers (the "August 2016 sales"). See id. at 22–23.

### B.

As for FPI's breach of contract counterclaim, FPI asserts that the MOU, "as amended and supplemented" by a June 3, 2015, PSS email, is a valid contract, and that PSS breached that contract when it did not pay commissions to FPI for the August 2016 sales. See [D.E. 12] 24; [D.E. 12-2] (June 3, 2015 emails); [D.E. 12-11] (August 8, 2016 purchase order for 79 solar light towers).

Under North Carolina law, a breach of contract has two elements: (1) a valid contract, and (2) one party's breach of the contract's terms. See, e.g., Montessori Children's House of Durham v. Blizzard, 244 N.C. App. 633, 636, 781 S.E.2d 511, 514 (2016); One Beacon Ins. Co. v. United Mech. Corp., 207 N.C. App. 483, 487, 700 S.E.2d 121, 124 (2010). One party's material breach

8

relieves the counter-party of its obligation to perform under the contract. See Peaseley v. Virginia Iron, Coal & Coke Co., 282 N.C. 585, 604, 194 S.E.2d 133, 146 (1973); Blizzard, 244 N.C. App. at 636, 781 S.E.2d at 514; Ball v. Maynard, 184 N.C. App. 99, 108, 645 S.E.2d 890, 897 (2007); McClure Lumber Co. v. Helmsman Constr., Inc., 160 N.C. App. 190, 198, 585 S.E.2d 234, 239 (2003). "A material breach" is one that "go[es] to the very heart of the instrument." Wilson v. Wilson, 261 N.C. 40, 43, 134 S.E.2d 240, 242 (1964). Generally, whether a breach is "material" is a question of fact for the jury. See, e.g., Supplee v. Miller-Motte Bus. Coll., 239 N.C. App. 208, 221, 768 S.E.2d 582, 593 (2015).

Assuming that the MOU, as modified by the June 3, 2015, emails, is a valid contract, FPI does not dispute that it did not provide PSS with monthly sales projections at any time during the business relationship. See Robertson Dec. [D.E. 135] ¶¶ 3–5. Thus, FPI breached the MOU. See Blizzard, 244 N.C. App. at 636, 781 S.E.2d at 514; United Mech. Corp., 207 N.C. App. at 487, 700 S.E.2d at 124. Moreover, FPI's breach was material. Under the MOU the parties sought to "trace FPI sales more effectively" and sought to do so by providing sales projections. [D.E. 12-1]. FPI's failure to provide the sales projections, therefore, "go[es] to the very heart" of the MOU. See Wilson, 261 N.C. at 43, 134 S .E.2d at 242. FPI did not respond to PSS's motion for summary judgment, and the facts in the record are not in dispute. Even viewing the facts in the record in a light most favorable to FPI, FPI materially breached the MOU at least two months after the June 3, 2015, emails modifying the MOU. Accordingly, PSS was relieved of its obligations under the MOU no later than August 2015, one year before FPI made the August 2016 sales. See Blizzard, 244 N.C. App. at 636, 781 S.E.2d at 514; Ball 184 N.C. App. at 108, 645 S.E.2d at 897; McClure, 160 N.C. App. at 198, 585 S.E.2d at 239. Accordingly, the court grants summary judgment to PSS concerning FPI's breach of contract counterclaim.

9

Alternatively, Robertson, on behalf of PSS, terminated the parties' obligations under the MOU when he rejected FPI's proposal for a new MOU in March 2016. Under North Carolina law,

> where no time is fixed for the termination of a contract it will continue for a reasonable time, taking into account the purposes that the parties intended to accomplish; and where the duration of the contract cannot be implied from its nature and the circumstances surrounding its execution, the contract is terminable at will by either party on reasonable notice to the other.

City of Gastonia v. Duke Power Co., 19 N.C. App. 315, 318, 199 S.E.2d 27, 30, cert. denied, 284 N.C. 252, 200 S.E.2d 652 (1973); see J.M. Smith Corp. v. Matthews, 123 N.C. App. 771, 774, 474 S.E.2d 798, 800–01 (1996); Citrini v. Goodwin, 68 N.C. App. 391, 397, 315 S.E.2d 354, 359 (1984). "Reasonable notice" generally means "prior notice," but can mean "notice effective immediately." Citrini, 68 N.C. App. at 397, 315 S.E.2d at 359 (collecting cases). As discussed, FPI was on notice that the MOU was terminated when Robertson rejected FPI's proposed new MOU. This conclusion is bolstered by the fact that FPI engaged Robertson to propose a new MOU in March 2016. Thus, the MOU was terminated, and PSS was relieved from its obligations under the MOU, before FPI completed the August 2016 sales. Alternatively, FPI was on notice that the MOU no longer governed PSS and FPI's relationship because Robertson sent multiple emails concerning the Dealer Agreement's termination and proposing that PSS and FPI enter a new international dealer agreement. Again, the MOU was terminated, and PSS was relieved from its obligations under the MOU, before FPI completed the August 2016 sales. Accordingly, the court grants summary judgment to PSS concerning FPI's breach of contract counterclaim.

In light of the court's holding, the court does not reach PSS's arguments concerning whether the Dealer Agreement governed PSS and FPI's relationship, whether the MOU is a valid contract, or whether FPI's efforts to sell 304 portable solar light towers were made in the absence of a contract with PSS. See [D.E. 129] 5–12.

As for FPI's claims concerning violations of the SRCA, FPI alleges that it was a sales representative for PSS under N.C. Gen. Stat. § 66-190 for the August 2016 sales, that the MOU granted FPI a commission from PSS for each portable solar light tower sold, that FPI sent a written demand for the commission under section 66-191, and that PSS has not paid the commission. See [D.E. 12] 24–25.

The SRCA presupposes the existence of a contract, written or unwritten, between the parties. See N.C. Gen. Stat. §§ 66-190 to -193; GAVCO, Inc. v. Chem-Trend, Inc., 81 F. Supp. 2d 633, 640–42 (W.D.N.C. 1999); cf. Market Choice, Inc. v. New England Coffee Co., No. 5:08–CV–90, 2009 WL 2590651, at *3–4 (W.D.N.C. Aug. 18, 2009) (unpublished). Moreover, the SRCA provides the sales representative a right of recovery for commissions earned under the contract in the event that the contract is terminated. See N.C. Gen. Stat. § 66-191; Hughes Indus. Sales, LLC v. Diamond Mfg. Co., No. 3:12–cv–0497, 2012 WL 5864479, at *3–4 (M.D. Pa. Nov. 19, 2012) (unpublished); Market Choice, 2009 WL 2590651, at *3–4; Morrison v. SACO Indus., Inc., No. 1:05-cv-1100, 2007 WL 148926, at *3 (M.D.N.C. Jan.16, 2007) (unpublished).

As discussed, assuming that FPI and PSS formed a contract under the MOU, FPI breached the MOU when it did not provide monthly sales projections to PSS, relieving PSS of its obligations under the contract. Accordingly, the August 2016 sales were not made pursuant to the MOU. Because FPI did not make the August 2016 sales under a contract, FPI does not have a claim under the SRCA. See N.C. Gen. Stat. §§ 66-190 to -191; GAVCO, 81 F. Supp. 2d at 641–42.

Alternatively, assuming that FPI and PSS formed a contract under the MOU, FPI has failed to demonstrate that it was owed commissions under the agreement. See N.C. Gen. Stat. § 66-191; Diamond Mfg. Co., 2012 WL 5864479, at *3–4; Market Choice, 2009 WL 2590651, at *3–4; Morrison, 2007 WL 148926, at *3. In fact, the MOU does not mention commissions for sales of

11

PSS's portable solar light towers. See [D.E. 12-1]. Accordingly, the court grants summary judgment to PSS concerning FPI's counterclaims under the SRCA.[5]

As for FPI's quantum meruit counterclaim, FPI alleges that PSS knew that FPI was marketing its products in the Middle East, that PSS promised to pay FPI a reasonable commission on all sales, that PSS received the benefits of FPI's sales of its products in the Middle East, and that PSS refuses to pay FPI its commission on those sales. See [D.E. 12] 25–26. Under North Carolina law, quantum meruit is an equitable remedy imposed by a court "in the absence of an express agreement" that allows a party to recover a reasonable value for services rendered to prevent the unjust enrichment of another party. Whitfield v. Gilchrist, 348 N.C. 39, 42, 497 S.E.2d 412, 415 (1998); see, e.g., Medlin Constr. v. Harris, 364 N.C. 577, 580, 704 S.E.2d 486, 489 (2010); Robertson v. Steris Corp., 234 N.C. App. 525, 532 n.4, 760 S.E.2d 313, 318 n.4 (2014). "To recover in quantum meruit, a plaintiff must show that (1) services were rendered to the defendant; (2) the services were knowingly and voluntarily accepted; and (3) the services were not given gratuitously." Johnson v. Starboard Ass'n, Inc., 244 N.C. App. 619, 629–30, 781 S.E.2d 813, 820 (quotation omitted), disc. review denied, 784 S.E.2d 175 (N.C. 2016); Highland Paving Co. v. First Bank, 227 N.C. App. 36, 43–44, 742 S.E.2d 287, 293 (2013); Crouse v. Mineo, 189 N.C. App. 232, 245, 658 S.E.2d 33, 41 (2008).

PSS's actions do not indicate that PSS "knowingly and voluntarily accepted" FPI's efforts concerning the August 2016 sales. See Johnson, 244 N.C. App. at 629–30, 781 S.E.2d at 820; Highland Paving Co., 227 N.C. App. at 43–44, 742 S.E.2d at 293; Crouse, 189 N.C. App. at 245, 658 S.E.2d at 41. In fact, the record demonstrates the opposite. See [D.E. 130] 9–13; [D.E. 133]

---

[5] In light of the court's holding, the court does not reach PSS's argument concerning whether FPI was entitled to commissions from PSS as contemplated in section 66-191 under the Dealer Agreement. See [D.E. 129] 12–13.

¶¶ 19–28, [D.E. 134] 106–14. Accordingly, the court grants summary judgment to PSS on FPI's quantum meruit counterclaim. In light of the court's holding, the court declines to reach PSS's argument concerning whether the Dealer Agreement foreclosed FPI's quantum meruit claim. See [D.E. 130] 13–14.

As for FPI's accounting counterclaim, FPI requests an "accounting of all sales pending by PSS" after January 1, 2015, in order to determine whether PSS owes FPI commissions other than those alleged under the MOU. See [D.E. 12] 26. Under North Carolina law, a party may not maintain an action for an accounting in the absence of a viable underlying cause of action. See Dunn v. Johnson, 115 N.C. 249, 20 S.E. 390, 390–91 (1894); Toomer v. Branch Banking and Trust Co., 171 N.C. App. 58, 70, 614 S.E.2d 328, 337 (2005); see also Market Choice, 2009 WL 2590651, at *12–13; Hampton v. Hanzel, No. 17 CVS 1259, 2018 WL 3304348, at *21 (N.C. Super. Ct. June 29, 2018) (unpublished). FPI does not have a valid underlying cause of action. Accordingly, the court grants summary judgment to PSS concerning FPI's accounting claim.

### III.

In its answer to PSS's amended complaint, SMS alleges that PSS misappropriated a trade secret of SMS when PSS used information contained in an SMS brochure in its own products, and that PSS tortiously interfered with SMS's business relationships when PSS sent a letter to Nobles Supply and ADS/TWI concerning SMS's alleged patent infringement. See [D.E. 93] 30–32. PSS moves for summary judgment concerning SMS's counterclaims [D.E. 131]. As discussed, SMS did not respond to PSS's motion.[6]

---

[6] SMS also does not oppose PSS's statements of material facts, and the court deems the material facts admitted. See Fed. R. Civ. P. 56(c); Local Civ. R. 56.1 (a)(2), (a)(4); See Horton, 2019 WL 320572, at *1 n.1; Felton, 295 F. Supp. 3d at 597 n.1; Howard, 262 F. Supp. 3d at 329 n.1.

13

## A.

In 2015, DLA placed an order with PSS for 250 portable solar light towers. See Robertson Decl. [D.E. 28] ¶¶ 56, 60. In connection with this order, PSS granted Long access to PSS's manufacturing facility in North Carolina. See id. ¶¶ at 61–62. As a condition of access to PSS's manufacturing facility, Long signed a non-disclosure and non-competition agreement on behalf of himself and FPI. See id. at ¶¶ 62–64. Long formed SMS two months after signing the non-disclosure and non-competition agreement. See id. at ¶¶ 62–63, 68.

On March 3, 2016, SMS entered into a contract with FPI wherein FPI would serve as a dealer for SMS. See id. at ¶ 76; [D.E. 134] 38–39. PSS first learned that SMS was competing with PSS for government contracts concerning portable solar light towers when DLA issued a request for quotations in June 2016. See Robertson Dec. at ¶¶ 73–76. FPI subsequently rejected PSS's proposed new dealer agreement. See [D.E. 134] 112–14.

On July 18, 2016, PSS, through counsel, sent FPI, SMS, SVV, Bills, Long, ADS/TWI, and Nobles Supply a letter "to apprise [SMS] of the Intellectual Property rights of [PSS]" in U.S. Patent No. 8,833,985 (the "'985 patent") and U.S. Patent App. No.14/459,421 (the "'421 application"). [D.E. 18-1] 10; see [D.E. 93] 30. In the letter, PSS states that an SMS-manufactured portable solar light tower "may fall within one or more of the claims of the '985 patent and/or the '421 application." [D.E. 18-1] 10. PSS's letter invited SMS "to discuss the matter further" with PSS so that the parties may "abate any potentially infringing activities by [SMS]." Id.

On July 26, 2016, SMS, through counsel, responded to PSS's July 18, 2016 letter. See [D.E. 134] 126–30. In the letter, SMS asserted that PSS's statements concerning the '985 patent were "baseless" and "constitute[d] tortious interference with business relations" between SMS, Nobles Supply, and ADS/TWI. See id. at 127–28. SMS also included with the letter a brochure for SMS's

14

portable solar light tower. See id. at 127, 129–30.[7] The brochure is two pages, describes features and specifications of the SMS portable solar light tower, and both pages include a stamp stating "proprietary data." See id. at 129–30.[8]

PSS and Robertson subsequently received the same brochure from DLA and ADS/TWI. See id. at 131–33, 134–37. The brochures DLA and ADS/TWI sent to PSS did not have the stamp stating "proprietary data." See id. at 132–33, 136–37.

### B.

As for SMS's trade secret misappropriation counterclaim, under North Carolina law, the Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152, et seq., defines "trade secret" as:

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
> > a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
> > b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3). Courts consider six factors to determine whether information is a trade secret under section 66-152(3):

> (1) the extent to which the information is known outside the business;
> (2) the extent to which it is known to employees and others involved in the business;
> (3) the extent of measures taken to guard secrecy of the information;
> (4) the value of the information to business and its competitors;
> (5) the amount of effort or money expended in developing the information; and

---

[7] SMS refers to the brochure as a "Data Sheet" in its complaint. See [D.E. 93] 31–32; [D.E. 132] 4.

[8] In the letter, SMS also states that "[w]e understand that [PSS] ha[s] a copy of the enclosed brochure," i.e., the data sheet. See id. at 127. PSS's founder, Robertson, responded to that letter and stated that "[PSS] d[id] not have a copy" of the brochure. See id. at 143.

15

(6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

TSG Finishing, LLC v. Bollinger, 238 N.C. App. 586, 591–92, 767 S.E.2d 870, 876 (2014); see, e.g., Sterling Title Co. v. Martin, 831 S.E.2d 627, 634 (N.C. Ct. App. 2019); Sunbelt Rentals, Inc. v. Head & Engquist Equipment, L.L.C., 174 N.C. App. 49, 53, 620 S.E.2d 222, 226 (2005); Area Landscaping, L.L.C. v. Glaxo-Wellcome, Inc., 160 N.C. App. 520, 525, 586 S.E.2d 507, 511 (2003).

The brochure is marked "proprietary information." [D.E. 134] 129–30. Nonetheless, all other evidence in the record, even viewed in a light most favorable to SMS, does not support the brochure as a trade secret. At his deposition, Long, SMS's founder and corporate representative, did not "recall" why the brochure was confidential information. See id. at 17. Long also did not know whether SMS took measures to guard the secrecy of the brochures. See id. at 16. PSS notified Long that both topics would be discussed at his deposition. See id. at 49–56. Furthermore, the SMS portable solar light tower was "designed, prototyped, and manufactured/fabricated by SMS to the U.S. military's specification," specifications which are generally known in the industry. See [D.E. 18-1] 7; Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr., 125 N.C. App. 174, 180–81, 480 S.E.2d 53, 56 (1997). Moreover, no evidence suggests that SMS took any measures to guard the brochure's secrecy. See Sunbelt Rentals, 174 N.C. App. at 55–56, 620 S.E.2d at 227–28. Rather, SMS shared the same brochure with third parties (and without marking the sheet as "proprietary data"), and the third parties were not restricted from sharing the brochure with PSS. See [D.E. 134] 128–30, 136–37; Area Landscaping, 160 N.C. App. at 526, 586 S.E.2d at 512; see also Krawiec v. Manly, 370 N.C. 602, 610–611, 811 S.E.2d 542, 548–49 (2018). Accordingly, the court grants summary judgment to PSS concerning SMS's trade secret misappropriation counterclaim.

Alternatively, PSS did not misappropriate SMS's brochure. To establish a prima facie case

16

of misappropriation under North Carolina law, a plaintiff must introduce "substantial evidence that the person against whom relief is sought both: (1) [k]nows or should have known of the trade secret; and (2) [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C. Gen. Stat. § 66-155. If a plaintiff establishes its prima facie case, the person accused of misappropriation may rebut that case by introducing "substantial evidence" that the person "acquired the information comprising the trade secret by independent development, reverse engineering, or it was obtained from another person with a right to disclose the trade secret." Id.; see, e.g., Horner Int'l Co. v. McKoy, 232 N.C. App. 559, 569, 754 S.E.2d 852, 859 (2014); GE Betz, Inc. v. Conrad, 231 N.C. App. 214, 233–34, 752 S.E.2d 634, 649–50 (2013).

Alternatively, even if SMS's brochure is a trade secret and that SMS established a prima facie case of misappropriation, and viewing the evidence in the record in a light most favorable to SMS, no evidence suggests that SMS, Nobles Supply, or DLA (i.e., the parties who disclosed the brochure to PSS) were prohibited from such a disclosure. See Pinkston v. Outdoor Equip. Distribs., No. 3:06cv222, 2007 WL 3028330, at *11 (W.D.N.C. Oct. 15, 2007) (unpublished); Safety Test & Equip Co. v. American Safety Util. Corp., No. 13-CVS-1037, 2015 WL 1880769, at *17 (N.C. Bus. Ct. Apr. 23, 2015) (unpublished). Accordingly, the court grants summary judgment to PSS concerning SMS's trade secret misappropriation counterclaim.

As for SMS's tortious interference with contract counterclaim, the Noerr-Pennington doctrine applies to business tort claims involving pre-litigation communications concerning patents. See, e.g., Globetrotter Software v. Elan Comp. Grp., Inc., 362 F.3d 1367, 1376 (Fed. Cir. 2004); IGEN Int'l, Inc. v. Roche Diagnostics GmbH, 335 F.3d 303, 310 (4th Cir. 2003). Whether Noerr-Pennington applies is a question of law. See, e.g., IGEN Int'l, 335 F.3d at 310.

17

"[F]ederal patent law preempts state-law tort liability for a patentholder's good faith conduct in communications asserting infringement of its patent and warning about potential litigation." Globetrotter, 362 F.3d at 1374; see 800 Adept, Inc. v. Murex Secs., Ltd., 539 F.3d 1354, 1369 (Fed. Cir. 2008). State-law tort claims survive only if the claim is based on "a showing of 'bad faith' action in asserting infringement," and the tort claimant bears the burden of alleging and proving bad faith. Globetrotter, 362 F.3d at 1374. Patent law "recognizes a presumption that the assertion of a duly granted patent is made in good faith." Golan v. Pingel Enterprise, Inc., 310 F.3d 1360, 1371 (Fed. Cir. 2002) (quotation omitted).

"Bad faith" has both subjective and objective prongs. 800 Adept, 539 F.3d at 1370; see Energy Heating, LLC v. Heat On-The-Fly, LLC, 889 F.3d 1291, 1304–05 (Fed. Cir. 2018); Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH, 524 F.3d 1254, 1260 (Fed. Cir. 2008). "The objective component requires a showing that the infringement allegations [we]re objectively baseless." 800 Adept, 539 F.3d at 1370 (quotation omitted); see Waugh Chapel S., LLC v. United Food & Com. Workers Union Local 27, 728 F.3d 354, 363 (4th Cir. 2013); Dominant, 524 F.3d at 1260; Globetrotter, 362 F.3d at 1375; see also Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 60 (1993) ("If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail."). "The subjective component relates to a showing that the patentee in enforcing the patent demonstrated subjective bad faith." 800 Adept, 539 F.3d at 1370; see Waugh Chapel S., 728 F.3d at 363; Globetrotter, 362 F.3d at 1376 n.8; see also Prof'l Real Estate Inv'rs, 508 U.S. at 60–61 ("[T]he court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process—as opposed to the outcome of that process—as an

18

anticompetitive weapon." (alteration, emphasis, and quotation omitted)). If the plaintiff fails to show that the patentholder's allegations are objectively baseless, the court need not reach the subjective prong. See Prof'l Real Estate Inv'rs, 508 U.S. at 60; 800 Adept, 539 F.3d at 1370; Dominant, 524 F.3d at 1260; Globetrotter, 362 F.3d at 1376 n.8; RE/MAX LLC v. Jones & Assocs., Ltd., No. 5:12–CV–768–D, 2013 WL 4647517, at *3 (E.D.N.C. Aug. 29, 2013) (unpublished).

The Noerr-Pennington doctrine applies to SMS's tortious interference with contract counterclaim. See Globetrotter, 362 F.3d at 1374–77; 800 Adept, Inc., 539 F.3d at 1369. Even viewing the record in a light most favorable to SMS, no rational jury could find that PSS's letter to SMS, Nobles Supply, and ADS/TWI was "objectively baseless." See, e.g., Waugh Chapel S., LLC, 728 F.3d at 363 ; Dominant, 524 F.3d at 1260; Globetrotter, 362 F.3d at 1375; see also Prof'l Real Estate Inv'rs, Inc., 508 U.S. at 60. Accordingly, the court grants summary judgment to PSS concerning SMS's tortious interference with contract counterclaim.

Alternatively, SMS fails to produce evidence to support its tortious interference with contract counterclaim. Under North Carolina law, a plaintiff must prove five elements for tortious interference with contract: (1) a valid contract between the plaintiff and a third-party that gives the plaintiff a contractual right against the third-party, (2) the defendant knows of the contract, (3) the defendant intentionally induces the third-party not to perform the contract, (4) the defendant acts without justification, and (5) the defendant's conduct causes actual damages to the plaintiff. See Krawiec, 370 N.C. at 606–07, 811 S.E.2d at 546; Embree Constr. Grp. v. Rafcor, Inc., 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992); United Labs., Inc. v. Kuykendall, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988); Miller v. Gerber Collision (Ne.), Inc., No. 4:19-CV-18-D, 2019 WL 2527105, at *2 (E.D.N.C. June 19, 2019) (unpublished); Clinical Staffing, Inc. v. Worldwide Travel Staffing Ltd., 60 F. Supp. 3d 618, 626–27 (E.D.N.C. 2013).

19

Even viewing the evidence in a light most favorable to SMS, no rational jury could find that PSS tortiously interfered with SMS's purported business relationships with Nobles Supply or ADS/TWI. In his deposition, Long, SMS's founder and corporate representative, stated that SMS did not have a business relationship with ADS/TWI. See [D.E. 134] 13. As for Nobles Supply, although SMS fulfilled an order that Nobles Supply placed through FPI, Long also admitted that SMS did not have a direct-sell relationship with Nobles Supply. See id. at 15, 59–67, 125. Importantly, the record does not demonstrate that SMS had a contractual relationship with either Noble or ADS/TWI. Moreover, Long admitted that he did not have documents to support a claim that PSS's actions cost SMS business with ADS/TWI or Nobles Supply. See id. at 15. Accordingly, the court grants PSS's motion for summary judgment concerning SMS's tortious interference with contract claim.

Additionally, SMS fails to produce evidence to support its tortious interference with prospective economic advantage counterclaim. Under North Carolina law, a plaintiff must show that (1) a prospective contract with a third party existed, (2) the tortfeasor "maliciously induc[ed]" the third party "not to enter a contract . . . which he would have entered into but for the interference," and (3) the interference proximately caused damages. Dalton v. Camp, 353 N.C. 647, 654, 548 S.E.2d 704, 709 (2001) (quotation omitted); see Coleman v. Whisnant, 225 N.C. 494, 506–07, 35 S.E.2d 647, 655–56 (1945); Radcliffe v. Avenel Homeowners Ass'n, Inc., 248 N.C. App. 541, 567, 789 S.E.2d 893, 911 (2016); Walker v. Sloan, 137 N.C. App. 387, 392–93, 529 S.E.2d 236, 241–42 (2000).

The first element requires a party to demonstrate the existence of a prospective contract. See, e.g., Dalton, 353 N.C. at 654–55, 548 S.E.2d at 710; Coleman, 225 N.C. at 506–07, 35 S.E.2d at 655–56. A prospective contract exists when there is a reasonable expectation that the third party,

20

but for the interference, would have entered into the contract. See, e.g., Owens v. Pepsi Cola Bottling Co. of Hickory, N.C., Inc., 330 N.C. 666, 680–81, 412 S.E.2d 636, 644–45 (1992); accord Dalton, 353 N.C. at 654–55, 548 S.E.2d at 710; Coleman, 225 N.C. at 506, 35 S.E.2d at 656. In Owens, the plaintiff "show[ed] that he had a valid business relationship with several [specific customers], and that he had a reasonable expectation of continuing to do business with these customers." Owens, 330 N.C. at 680, 412 S.E.2d at 644–45. Conversely, in Dalton, the Supreme Court of North Carolina affirmed summary judgment for a defendant when the evidence showed that the plaintiff's contract negotiations with a third party had collapsed after a disagreement over terms and "such circumstances fail[ed] to demonstrate that a . . . contract would have ensued." Dalton, 353 N.C. at 655, 548 S.E.2d at 710. Moreover, the "expectation of a continuing business relationship," alone, is not sufficient to support a tortious interference claim. Id.

Even viewing the record in a light most favorable to SMS, the record does not support SMS's counterclaim concerning tortious interference with prospective economic advantage. As for ADS/TWI, a February 8, 2017, email from an ADS/TWI representative lists multiple reasons that ADS/TWI did not want to do business with SMS (SMS's lack of response to ADS/TWI's request for specs, deposit requirements, SMS's relationship with Nobles Supply), and does not mention PSS. See [D.E. 134] 120. As for Nobles Supply, the DLA representative acknowledged in a February 1, 2017, email that neither ADS/TWI nor Nobles Supply "will quote from [SMS]." Id. at 123–24; see also 69–71, 118–19. Moreover, Long did not have documents to show that PSS's actions resulted in ADS/TWI or Nobles Supply canceling business with SMS. See id. at 15, 18. Rather, SMS can only point to the "expectation of a continuing business relationship," which cannot support a tortious interference claim. Dalton, 353 N.C. at 655, 548 S.E.2d at 710. Accordingly, the court grants

21

summary judgment to PSS concerning SMS's tortious interference with prospective economic advantage counterclaim.

## IV.

PSS moves for an entry of default, default judgment, and to strike SMS's answer in the 2017 lawsuit and the 2019 lawsuit. See [D.E. 140], [D.E. 34]. SMS did not respond to PSS's motions in either lawsuit. Because the motions are substantially similar, the court addresses the motions together.

Morris, Manning & Martin, LLP ("Morris Manning") represented SMS in both the 2017 lawsuit and the 2019 lawsuit. On December 18, 2019, Morris Manning moved to withdraw as attorneys for all defendants, including SMS, in both the 2017 lawsuit and the 2019 lawsuit. See [D.E. 136], [D.E. 30]. On December 19, 2019, this court granted Morris Manning's motion in both the 2017 lawsuit and the 2019 lawsuit. See [D.E. 137], [D.E. 31]. In its order granting Morris Manning's motion, this court also ordered entity parties to cause new counsel to file a notice of appearance within 21 days of the court's order. See [D.E. 137], [D.E. 31]. The court stated that "[a] party that fails to . . . cause new counsel to file a notice of appearance may be subject to sanctions, including but not limited to dismissal or default judgment." [D.E. 137], [D.E. 31]. To date, SMS has not caused new counsel to file a notice of appearance on its behalf in either the 2017 lawsuit or the 2019 lawsuit.

PSS argues that because SMS is an unrepresented corporation and has not defended itself in either the 2017 lawsuit or the 2019 lawsuit, this court should enter a default and grant default judgment against SMS and strike SMS's answer. See [D.E. 140] 1–2; [D.E. 34] 1–2.

As a preliminary matter, SMS did not comply with the court's scheduling order when SMS failed to cause new counsel to file a notice of appearance on its behalf in the 2017 lawsuit or the

22

2019 lawsuit. A corporation "cannot appear pro se and must be represented by an attorney . . . ." E.D.N.C. Local Civ. R. 5.2(b)(2); see Rowland, 506 U.S. 194, 201–02 (1993). Moreover, a lay person cannot represent a corporation. See Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council, 506 U.S. 194, 201–02 (1993); In re Under Seal, 749 F.3d 276, 290 n.17 (4th Cir. 2014). SMS admits that it is a corporation, see [D.E. 93] 27, and no attorney has filed a notice of appearance on SMS's behalf in the 2017 lawsuit or 2019 lawsuit. Accordingly, SMS has failed to comply with this court's order.

The court recognizes that it could exercise its discretion to enter a default, grant summary judgment to PSS concerning PSS's claims against SMS, and strike SMS's answer because SMS has failed to defend itself in the 2017 lawsuit or 2019 lawsuit by not causing new counsel to file a notice of appearance on its behalf. See Home Port Rentals, Inc. v. Ruben, 957 F.2d 126, 133 (4th Cir. 1992); Eagle Assocs. v. Bank of Montreal, 926 F.2d 1305, 1310 (2d Cir. 1991); United States v. Moradi, 673 F.2d 725, 727 (4th Cir. 1982); Pert 35, Inc. v. Amari Aviation Ltd., No. 3:09-CV-0448 TJM/DEP, 2010 WL 1257949, at *3 (N.D.N.Y. Mar. 5, 2010) (unpublished); Team Air Express, Inc. v. A. Heffco Techs., Inc., No. 06 CV 2742 NG (CLP), 2008 WL 4790469, at *2 (E.D.N.Y. Jan. 7, 2008) (unpublished); Microsoft Corp. v. Comput. Serv. & Repair, Inc., 312 F. Supp. 2d 779, 783 (E.D.N.C. 2004). The court declines to exercise that discretion, but warns SMS that if SMS continues to fail to comply with this court's order concerning causing new counsel to file a notice of appearance on its behalf, the court will enter a default, grant default judgment against SMS, and strike SMS's answer. Cf. Hathcock v. Navistar Int'l Transp. Corp., 53 F.3d 36, 40–41 (4th Cir. 1995). The court directs SMS to cause new counsel to file a notice of appearance on its behalf no later than October 16, 2020.

23

# V.

On March 6, 2020, Bills moved to dismiss the claims against him in the 2017 lawsuit and the 2019 lawsuit. See [D.E. 142], [D.E. 36]. On March 27, 2020, PSS responded in opposition. See [D.E. 143], [D.E. 39]. The motions are identical, and the court considers them together.

Bills did not file his motion by the deadline established in the court's scheduling order. On December 12, 2018, the court granted PSS's motion to amend the scheduling order and ordered that "all potential dispositive motions must be filed within 75 days of the date on which the [c]ourt rules on the last of [p]laintiff's pending [m]otions to compel." [D.E. 113] 1. On September 17, 2019, Magistrate Judge Gates issued an order concerning the last of PSS's motion to compel. See [D.E. 126]. Accordingly, the deadline to file dispositive motions was December 2, 2019. On March 6, 2020, Bills moved to dismiss PSS's claims, over three months past the deadline to file such motions. Accordingly, the court denies Bills's motion as untimely. See Michael Borovsky Goldsmith LLC v. Jewelers Mut. Ins. Co., 359 F. Supp. 3d 306, 315 (E.D.N.C. 2019); Velasquez v. Salsas & Beer Rest., Inc., No. 5:15-CV-146-D, 2016 WL 3339488, *2 (E.D.N.C. June 13, 2016) (unpublished).

Alternatively, Bills does not demonstrate good cause for the court to amend its scheduling order. Rule 16 of the Federal Rules of Civil Procedure provides, in relevant part, that "the district judge . . . must issue a scheduling order" after the parties file a Rule 26(f) report or after the scheduling conference. Fed. R. Civ. P. 16(b)(1). "The scheduling order must limit the time to . . . complete discovery[] and file motions." Fed. R. Civ. P. 16(b)(3)(A). The court may modify a scheduling order "only for good cause and with" the court's consent. Fed. R. Civ. P. 16(b)(4). The good cause standard "focuses on the timeliness of the amendment and the reasons for its tardy submission; the primary consideration is the diligence of the moving party." Montgomery v. Anne Arundel Cty., 182 F. App'x 156, 162 (4th Cir. 2006) (per curiam) (unpublished); see Hexion

24

Specialty Chems., Inc. v. Oak-Bark Corp., No. 7:09-CV-105-D, 2011 WL 4527382, at *8 (E.D.N.C. Sept. 28, 2011) (unpublished). "Good cause exists when a party's reasonable diligence before the amendment deadline would not have resulted in the discovery of the evidence supporting a proposed amendment." Sansotta ex rel. Klaus v. Town of Nags Head, No. 2:10-CV-29-D, 2011 WL 3438422, at *2 (E.D.N.C. Aug. 5, 2011) (unpublished); see United States v. Godwin, 247 F.R.D. 503, 506 (E.D.N.C. 2007). A scheduling order is "not a frivolous piece of paper, idly entered, which can be cavalierly disregarded," and a movant "must demonstrate that the reasons for the tardiness of his motion justify a departure from" the scheduling order. Rassoull v. Maximus, Inc., 209 F.R.D. 372, 373–74 (D. Md. 2002) (quotation omitted).

Bills offers no explanation for failing to meet the court's deadlines. See [D.E. 142], [D.E. 36]. Accordingly, Bills has not demonstrated good cause for the court to amend its scheduling order to consider Bills's motion. Thus, the court denies Bills's motion.

Alternatively, Bills's motion does not propose grounds on which to dismiss PSS's claims against him. Bills argues that, because of his position as an employee of FPI, he should not be liable to PSS. See [D.E. 142] 1, [D.E. 36] 1. North Carolina law recognizes the "common-law exception to individual liability in a corporate context for an individual's tort liability." White v. Collins Bldg., Inc., 209 N.C. App. 48, 56, 704 S.E.2d 307, 312 (2011); see Palomino Mills, Inc. v. Davidson Mills Corp., 230 N.C. 286, 292–93, 52 S.E.2d 915, 919–20 (1949); Embree Constr. Grp., Inc. v. Rafcor, Inc., 97 N.C. App. 418, 423, 388 S.E.2d 604, 607 (1990). PSS's claims against Bills sound in tort. See [D.E. 89] ¶¶ 98–106, 107–18, 123–29, 161–63; [D.E. 1] ¶¶ 56–66, 67–84, 85–96. Accordingly, the court denies Bills's motion to dismiss.

VI.

As for Long's motion to dismiss, see [D.E. 37], Long cannot file a motion on behalf of SMS.

25

See Rowland, 506 U.S. at 201–02; In re Under Seal, 749 F.3d at 290 n.17. To the extent Long purports to represent SMS in his motion to dismiss, the court denies the motion.

Additionally, Long's motion is untimely under Federal Rule of Civil Procedure Rule 12(b). "A motion asserting any [Rule 12(b)] defense[] must be made before a pleading if a responsive pleading is allowed." See Fed. R. Civ. P. 12(b). Accordingly, a motion under Rule 12(b)(6) is untimely when filed after a party files its answer. The Fourth Circuit construes an untimely motion under Rule 12(b)(6) as a motion for judgment on the pleadings under Rule 12(c). See, e.g., Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999); Hardy v. Lewis Gale Med. Ctr., LLC, 377 F. Supp. 3d 596, 605 (W.D. Va. 2019); Bierman Fam. Farm, LLC v. United Farm Fam. Ins. Co., 265 F. Supp. 3d 633, 637 (D. Md. 2017). On May 6, 2019, Long filed a responsive pleading. See [D.E. 13]. Almost one year later, on March 6, 2020, Long filed the his motion to dismiss. See [D.E. 37]. Long's motion is untimely. See Fed. R. Civ. P. 12(b).

Alternatively, even if the motion is timely under Rule 12(c), a court should grant the motion if "the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." Park Univ. Enters. v. American Cas. Co. of Reading, 442 F.3d 1239, 1244 (10th Cir. 2006) (quotation omitted), abrogated on other grounds by Magnus, Inc. v. Diamond State Ins. Co., 545 F. App'x 750 (10th Cir. 2013) (unpublished); see Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 375 (4th Cir. 2012); Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 405–06 (4th Cir. 2002). A court may consider the pleadings and any materials referenced in or attached to the pleadings, which are incorporated by reference. See Fed. R. Civ. P. 10(c); Fayetteville Inv'rs v. Com. Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991). A court also may consider "matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). The same

26

standard applies under Rule 12(c) and Rule 12(b)(6). See Mayfield, 674 F.3d at 375; Burbach Broad. Co., 278 F.3d at 405–06.

The court has thoroughly considered all of the arguments, and finds that Long has not clearly demonstrated that no material issue of fact remains unresolved and that he is entitled to judgment. See, e.g., Mayfield, 674 F.3d at 375; Burbach Broad. Co., 278 F.3d at 405–06. Accordingly, the court denies Long's motion.

## VII.

PSS argues that Bills committed various discovery violations under Rule 37(b) and 37(c) of the Federal Rules of Civil Procedure. See [D.E. 144]. Specifically, PSS asserts that Bills failed to respond adequately to the court's September 17, 2019 motion to compel as evidenced by documents Bills attached to his motion to dismiss PSS's complaint, and that Bills destroyed FPI files despite instructions from FPI's acting CEO not to destroy such files. See id. at 1–4.

District courts enjoy broad discretion to impose sanctions under Federal Rule of Civil Procedure 37(b) for failure to comply with discovery orders. See, e.g., Hinkle v. City of Clarksburg, 81 F.3d 416, 426 (4th Cir. 1996); Hathcock v. Navistar Int'l Trans. Corp., 53 F.3d 36, 40–41 (4th Cir. 1995). Such sanctions include, but are not limited to:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
> (iii) striking pleadings in whole or in part;
> (iv) staying further proceedings until the order is obeyed;
> (v) dismissing the action or proceeding in whole or in part;
> (vi) rendering a default judgment against the disobedient party; or
> (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A). Rule 37(b) also specifies that "the court must order the disobedient

Case 5:19-cv-00005-D    Document 50    Filed 09/24/20    Page 27 of 30

party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Id. 37(b)(2)(C).

The court has discretion to both specifically and generally deter litigant misconduct through an entry of default. Cf. Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 643 (1976) (per curiam). The court, however, must usually provide notice to the offending party that failure to comply with the court's orders will result in an entry of default or striking a defendant's answer. See Hathcock, 53 F.3d at 40; RDLG, LLC v. Leonard, 649 F. App'x. 343, 347–48 (4th Cir. 2016) (per curiam) (unpublished). Furthermore, the district court must usually employ some lesser sanction before resorting to the ultimate sanction of entry of default, or striking a defendant's answer. See Anderson v. Found. for Advancement. Educ., & Emp. of Am. Indians, 155 F.3d 500, 504–05 (4th Cir. 1998).

Under Federal Rule of Civil Procedure 37(c), a party that fails to provide documents in discovery under Rule 26(a) or (e) is "not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). As for whether the nondisclosure was substantially justified or harmless, the court considers five factors, among others:

> (1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure that surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to name the witness before trial; and (5) the importance of the testimony.

S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 595, 597 (4th Cir. 2003). The nondisclosing party bears the burden of showing that its failure to disclose was substantially justified or harmless. See Bresler v. Wilmington Trust Co., 855 F.3d 178, 190 (4th Cir. 2017).

28

As for PSS's arguments under Rule 37(b) and 37(c), the court has not yet warned Bills that his failure to timely respond to discovery will result in an entry of default against him, and the court has not yet employed any sanction less severe than an entry of default judgment. At the same time, the court rejects Bills's arguments that he provided "all information he had in his possession at the time this suit was filed." [D.E. 146] 13. Bills's filings concerning his motion to dismiss directly contradict this claim. See [D.E. 142], [D.E. 36]. Accordingly, the court imposes lesser sanctions on Bills, and requires Bills to pay the costs that PSS incurred, including attorneys' fees, in filing its motions for sanctions. The court also warns Bills that failure to timely comply with this order will result in dismissal.

## VIII.

PSS moves to extend the scheduling order deadline for filing dispositive motions to either 45 days after this court's disposition of PSS's motion to compel [D.E. 40], or 45 days after this court's disposition of PSS's motion to consolidate [D.E. 25]. See [D.E. 44]. The court recognizes both that defendant Bills has not complied with PSS's discovery requests, and that PSS's motion to compel discovery from Bills is pending. The court also recognizes that PSS timely filed its request to extend the deadline, and that the deadline has now passed. See [D.E. 19]. Furthermore, Bills's arguments in opposition are meritless. See [D.E. 45]. Therefore, the court finds good cause to extend the deadline for filing dispositive motions. Dispositive motions must be filed by November 16, 2020. All provisions of the scheduling order [D.E. 19] not expressly modified herein shall remain in effect.

## IX.

In sum, the court GRANTS PSS's motions to consolidate [D.E. 123], [D.E. 25], GRANTS PSS's motion for summary judgment concerning FPI's counterclaims [D.E. 129], GRANTS PSS's

29

motion for summary judgment concerning SMS's counterclaims [D.E. 131], DENIES PSS's motion

for an entry of default, default judgment, and to strike SMS's answer [D.E. 140], [D.E. 34], WARNS

SMS that it must cause new counsel to file a notice of appearance on or before October 16, 2020,

DENIES Bills's motions to dismiss [D.E. 142], [D.E. 36], DENIES Long's motion to dismiss [D.E.

37], DENIES PSS's motion for sanctions [D.E. 144], WARNS Bills that failure to comply with this

court's orders will result in the court entering default judgment against him, ORDERS Bills to pay

PSS's costs associated with its motion for sanctions, and GRANTS PSS's motion to extend the

scheduling order deadlines [D.E. 44]. The deadline for filing dispositive motions is November 16,

2020.

      SO ORDERED. This _24_ day of September 2020.

                                                      JAMES C. DEVER III
                                                     United States District Judge